UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PAMELA D. McKINNEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 12 C 220 |
| v. | ) |
| | ) Judge George M. Marovich |
| JEH JOHNSON, Secretary | ) |
| U.S. DEPARTMENT OF | ) |
| HOMELAND SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Pamela D. McKinney ("McKinney") filed suit against Jeh Johnson, Secretary of the United States Department of Homeland Security.[1] McKinney alleges that she was discriminated against on the basis of her age, sex and race (in violation of the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964) and that she was retaliated against for complaining about discrimination. Defendant has filed a motion for summary judgment. For the reasons set forth below, the Court grants in part and denies in part defendant's motion for summary judgment.

**I.    Background**

Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Facts that are argued but do not conform with the rule are not considered by the Court. For example, facts included in a party's brief but not in its statement of facts are not

---

[1]McKinney originally filed her suit against former Secretary, Janet Napolitano, for whom Jeh Johnson has been automatically substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact *with citation to admissible evidence*, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of its duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

The following facts are undisputed unless otherwise noted.

Plaintiff McKinney worked for FEMA from June 2006 until March 2007. During that time, she held two different positions. FEMA first hired McKinney in June 2006 as a Disaster Assistance Employee. A Disaster Assistance Employee is one who is on-call to work during disasters. Not long after she was hired, McKinney was called upon to work on a disaster in Ohio. McKinney worked out of a Joint Field Office in Ohio, which was headed by Stacy Grathen ("Grathen"), the acting Federal Coordinating Officer. Grathen normally worked in Chicago but, like McKinney, was assigned to work out of the Joint Field Office in Ohio, because FEMA was handling some kind of disaster.

While McKinney and Grathen were working a disaster in Ohio, Grathen was told (by whom is not clear) that McKinney had caused a disturbance at the hotel. (The hotel has no record of any disturbance, and it is not clear from the record whether any disturbance actually happened.) Grathen, in turn, told her direct supervisor, Bill Powers. McKinney was upset that Grathen had told Grathen's supervisor, so McKinney complained to the Office of Equal Rights that she had been discriminated against on the basis of her race and sex. McKinney believed that

it had been one Bernie Fernandez (more on him later) who had reported the alleged hotel disturbance to Grathen.

It seems that at least some of McKinney's time at the Joint Field Office in Ohio was spent in training. On August 25, 2006, McKinney received a performance review of "satisfactory" for three weeks of training at the Joint Field Office in Ohio.

In the meantime, McKinney had applied for another position within FEMA. In May 2006, FEMA had posted three CORE positions in disaster recovery closeout, which seems to mean the process of making sure all claims have been paid and all recovery work completed. CORE positions are temporary positions that can be terminated at almost any time. The three positions FEMA advertised for were to continue for not more than two years and were listed as being available at the GS-9, GS-11 and GS-12 levels, depending on the knowledge, skills and ability of the individual filling the position. A position at GS-12 pays better than a position at GS-11 or GS-9.

McKinney applied for the CORE position in June 2006. When she applied, McKinney stated on her cover letter that she would accept a position at the GS-9 level. The first thing that happened with the applicants for the CORE positions is that a FEMA personnel specialist (Vicki Hartless) in Virginia reviewed the applicants' resumes to determine the GS level at which each applicant could be hired. Vicki Hartless determined that McKinney was qualified only at the GS-9 level, and, when she did so, Vicki Hartless did not know the sex, race or age of any of the candidates (including McKinney) for the three CORE positions.

The second thing that happened with respect to McKinney's application for a CORE position is that two FEMA employees--Bill Powers and Larry Bailey ("Bailey")--interviewed McKinney. Bailey was the recovery branch chief, and he had the power to hire, fire and discipline employees within the group. After Bill Powers investigated the report of the alleged

disturbance at the hotel, Bailey offered McKinney a CORE position as a closeout specialist at the GS-9 level. She started in October 2006.

McKinney was not the only CORE closeout specialist FEMA hired. At about the same time, FEMA also hired Jason Kirkman ("Kirkman") and Don Simko ("Simko"). At the time Kirkman was hired, he had worked for FEMA as a Disaster Assistance Employee for nine years. He had experience performing financial review and reconciliation in disaster closeouts. Simko was a West Point graduate with a degree in cartography and environmental engineering. Simko had completed two internships with FEMA, during which time he worked on disaster closeouts. Both Simko and Kirkman were hired at higher GS levels than was McKinney and, thus, were paid more that she was paid. At about the same time, FEMA also hired Nick Mueller ("Mueller") as the closeout team's data coordinator. Mueller was hired at the GS-7 level.

By January 2007, McKinney learned that Simko and Kirkman were being paid more, and she did not like it. She asked Bailey about it. She also asked Bailey for an opportunity to learn more about agency computer systems. To that end, Bailey assigned McKinney to "back-up" Mueller, the team's data coordinator. McKinney did not want to "back-up" Mueller, because he was lower on the GS scale. McKinney thought the assignment was retaliatory (apparently for her having asked Bailey about the pay discrepancy between herself, on the one hand, and Kirkman and Simko, on the other). When McKinney complained to Bailey about backing up a GS-7 employee, Bailey relieved McKinney of the obligation. For the same reason, Bailey also relieved McKinney of the three-day training at which she was supposed to learn how to "back up" Mueller's data-entry work. McKinney thought it was retaliatory to relieve her of the training opportunity.

On January 26, 2007, Bailey gave McKinney a performance review. For each of ten performance criteria, Bailey had the choice of rating McKinney either "Less Than Expected" or "On Target." Bailey rated McKinney as being, "On Target" for each category.

On February 9, 2007, McKinney contacted FEMA's Office of Equal Rights to complain about age, race and sex discrimination. Details about her complaint are not in the record.

Later in February 2007, Bailey sent the closeout team members (i.e., Kirkman, McKinney, Mueller and Simko) to two weeks of training at the Joint Field Office in Peoria. The training was scheduled to run from February 12, 2007 until February 23, 2007. On day three of training, McKinney met with Mike Smith, the Federal Coordinating Officer in charge of the Peoria office, in order to tell him that she was not comfortable at the Peoria office, because Bernie Fernandez (the same Bernie Fernandez who McKinney believed had told Grathen of the alleged hotel disturbance) "was possibly going to be present." On day four, McKinney left, without Bailey's permission, because it "was difficult for [her] to complete the assignment" due to "tensions." Mike Smith asked McKinney to sign a statement saying that she was leaving training "of her own volition." McKinney declined and thought Mike Smith was discriminating against her. When McKinney returned to Chicago, she refused to discuss with Bailey her reasons for leaving the training.

On February 23, 2007, McKinney had a meeting with Bailey and David Skarosi, who was Bailey's supervisor. Bailey and Skarosi demanded that McKinney stop contacting the EEO office and start discussing issues with them. Skarosi told McKinney that "issues could be resolved on his level" and that she should "drop the Complaint."

A few weeks later, Grathen was promoted to the position of team leader of the closeout team. She replaced Bill Powers. As team leader, Grathen assigned work but did not have the power to hire, fire or discipline. That power remained with Bailey.

On March 15, 2007, Grathen held a training meeting with the closeout team. At the meeting, Grathen told the team, among other things, that they should not call management at home if the matter could wait until the next business day. McKinney was absent on March 15, 2007. So, on March 19, 2007, Grathen met with McKinney to tell McKinney what she had told the others at the meeting. Among other things, Grathen told McKinney not to call management at home if the matter could wait until the next business day.

Grathen's instruction to McKinney led to all sorts of nonsense. First, McKinney spoke to a co-worker, Rolando Rivera, who was *not* a manager, and apologized for calling him at home. McKinney told Rolando Rivera that Grathen had told her not to call him at home. Rolando Rivera, in turn, yelled at Grathen. The next day, on March 20, 2007, Grathen found McKinney at her desk and angrily relayed the conversation she had had with Rolando Rivera. McKinney got up and walked away. Grathen followed and threatened to write her up. Among other things, Grathen told McKinney, "People are abusive here. If you can't handle abuse, you should leave."

The nonsense continued. McKinney called the Federal Protective Services to complain that Grathen had threatened to write her up. McKinney wrote emails to Elizabeth Barentzen (whose job at FEMA was to advise managers and employees on disciplinary issues) and Robert Dyson (who was an EEO counselor at FEMA). In one email, McKinney stated that she was experiencing "a modern lynching," and, in another, she asked what the consequences would be if she contacted the media.

The next day, March 21, 2007, McKinney spoke to Dyson. McKinney told him she did not want to interact with Grathen and that she was planning to speak with two attorneys about obtaining a restraining order against Grathen. McKinney asked Dyson who she should ask for a leave of absence when she could not ask her immediate supervisor. Dyson told McKinney she

should ask Bailey or Bailey's supervisor. McKinney told Dyson that she did not want to meet with Bailey without an attorney present.

At this point, Bailey was concerned about McKinney's conduct. Bailey concluded that she had trouble with authority figures and problems working with a group. Bailey was troubled by what he perceived as McKinney's inability to follow the chain of command, a quality which, to Bailey's mind, was not conducive to a work organization. Bailey concluded that these qualities, together with McKinney's refusal to meet with him and her threat to "call the police and everybody else over a disagreement with a person" made McKinney someone whose employment should be terminated. Barentzen prepared a notice of termination, and FEMA terminated McKinney's employment on March 27, 2007 for "conduct unbecoming a federal employee."

McKinney appealed the termination of her employment to David Skarosi, who upheld the termination. McKinney appealed. In September 2008, at a proceeding before an Administrative Law Judge, McKinney withdrew her claims of age and sex discrimination. In April 2010, FEMA issued a final agency decision denying McKinney's remaining claims of discrimination, and on October 21, 2011, the EEOC affirmed the agency's decision.

McKinney brought her claims to this Court, and defendant filed a motion for summary judgment.

## II. **Summary Judgment Standard**

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to

make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

**III.    Discussion**

   **A.    McKinney's claims for sex and age discrimination**

Defendant argues that McKinney has failed to exhaust her administrative remedies with respect to her claims for sex and age discrimination, because McKinney withdrew these claims at the administrative level. *Hill v. Potter*, 352 F.3d 1142, 1145-1146 (7th Cir. 2000). That fact is undisputed, and McKinney does not dispute the legal conclusion either.

The Court agrees that McKinney failed to exhaust her administrative remedies with respect to her claims of age and sex discrimination and, therefore, grants defendant summary judgment on those claims.

   **B.    McKinney's claim for race discrimination**

McKinney also claims that she was discriminated against on the basis of her race. Pursuant to Title VII of the Civil Rights Act of 1964, it "shall be an unlawful employment practice for an employer–(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To be actionable as discrimination under Title VII, a difference in treatment must be material. *Minor v. Centorcor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006).

"[M]any day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms or conditions" are not actionable. *Minor*, 457 F.3d at 634.

McKinney argues that defendant discriminated against her on the basis of her race in four respects: (1) when Grathen told her boss that she had heard McKinney caused a disturbance at a hotel; (2) by paying her less than her two co-workers; (3) by assigning her to "back-up" the GS-7 employee; and (4) by terminating her employment. Defendant moves for summary judgment on McKinney's race claim.

The Court finds no direct or circumstantial evidence in the record that any of these things were caused by race, so McKinney must proceed using the indirect method of proof. To make out a *prima facie* case of race discrimination, a plaintiff must put forth evidence that: (1) she is a member of a protected class; (2) she was meeting the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly-situated employee not in her protected class was treated more favorably. *Alexander v. Casino Queen, Inc.*, __ F.3d __, __, 2014 WL 57947 at *6 (7th Cir. 2014). The "burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It requires a plaintiff to show that she was "rejected under circumstances which give rise to an inference of unlawful discrimination," and the "standard is not inflexible" because facts vary in different cases. *Burdine*, 450 U.S. at 253 and n.6. If plaintiff makes out a *prima facie* case of race discrimination, defendant has the light burden of *articulating* a legitimate, non-discriminatory reason for the adverse action. *Alexander*, __ F.3d at __, 2014 WL 57947 at *6. If defendant does so, plaintiff has the burden to show that the proffered reason was just a pretext for

race discrimination. *Id.* A pretext is a dishonest explanation, rather than an error. *See Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009). To show pretext, McKinney "must establish that the explanation is a lie, which permits a jury to infer that the tale has been concocted to conceal an unlawful truth. It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law. Poor personnel management receives its comeuppance in the market rather than the courts." *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) (internal citations omitted).

Two of the actions McKinney points to as discriminatory do not qualify as adverse employment actions. The fact that Grathen told her boss about the hotel disturbance had no impact on the terms or conditions of McKinney's employment. McKinney was hired into the CORE position, *despite* what Grathen told her boss. Likewise, Bailey's decision to have McKinney "back-up" someone at a lower GS level had no impact on the terms or conditions of McKinney's employment. As soon as McKinney told Bailey she did not want that responsibility, Bailey relieved her of it.

The other two actions--the disparate pay and the termination of her employment--are explicitly actionable. 42 U.S.C. § 2000e-2(a). With respect to the disparate pay, McKinney points to two similarly-situated individuals who were paid more. Specifically, Kirkman and Simko were hired at about the same time as McKinney to do the same job. Although there is no evidence in the record as to Kirkman's or Simko's race, the Court will assume (without deciding) that they are outside of McKinney's protected class and that she can make out a *prima facie* case of race discrimination. Defendant says the reason that Kirkman and Simko were paid more is that they were classified at a higher GS level due to their work experience. Both had worked for

FEMA in the past. McKinney has put forth no evidence that these reasons are pretext for discrimination. To the contrary, the undisputed evidence is that the person who determined the appropriate GS-classifications of the applicants did not know the races of the applicants. Thus, McKinney's claim that she was paid less due to her race cannot survive summary judgment.

The Court also assumes without deciding that McKinney can make out a *prima facie* case of race discrimination with respect to the termination of her employment. Here, too, defendant has articulated a legitimate, non-discriminatory reason for terminating McKinney's employment. Defendant says McKinney was terminated for conduct unbecoming a federal employee. It is undisputed that Bailey believed McKinney had trouble with authority figures and problems working with a group. It is undisputed that Bailey thought it was inappropriate for McKinney to call Federal Protective Services and to suggest she would call the media over a disagreement with her supervisor. The record contains no evidence that Bailey's beliefs were anything but honestly held. In fact, it is undisputed that McKinney actually did the things (calling Federal Protective Services, suggesting she would call the media, suggesting she would seek a restraining order against a supervisor) that Bailey thought were inappropriate. Furthermore, the record contains no evidence that race had anything to do with the decision to terminate McKinney's employment.

Defendant is entitled to judgment as a matter of law on McKinney's race discrimination claim. Accordingly, defendant is granted summary judgment on McKinney's race discrimination claim.

### C. McKinney's retaliation claim

Finally, McKinney claims that she was retaliated against in violation of Title VII. Specifically, McKinney claims that her employment was terminated in retaliation for her having complained about discrimination.[2]

McKinney attempts to defeat summary judgment using the direct method of establishing retaliation. To establish retaliation under the direct method, McKinney must show: (1) she engaged in protected conduct; (2) she suffered a material, adverse action; and (3) a causal connection between the two. *Coleman v. Donahue*, 667 F.3d 835, 859 (7th Cir. 2012). "Causality is typically one of the highest hurdles retaliation plaintiffs must clear." *Benuzzi v. Board of Ed. of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011). To establish causation, McKinney must show that her EEO complaint was a "substantial or motivating factor" in defendant's decision to terminate her employment. *Coleman*, 667 F.3d at 860.

Defendant first argues that McKinney cannot show that she engaged in protected conduct, because she could not have had a good faith belief that she was discriminated against.

---

[2]McKinney does not argue in response to defendant's motion for summary judgment that any other actions constitute retaliation. That makes sense, because none of the other actions in the record are material, adverse actions. To have an actionable claim for retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). The adversity must be "material" in order "to separate significant from trivial harms." *Id.* The standard is "general" because "the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington Northern*, 548 U.S. at 69. The only other potentially-adverse actions in the record are: (1) Bailey's decision to assign McKinney to "back-up" a GS-7 (which he promptly changed when McKinney complained); and (2) his decision to take away a three-day training session (which training McKinney no longer needed once she decided she did not want to perform the duties of backing up the GS-7 employee). Those actions were not materially adverse.

Defendants points out that McKinney often complained about discrimination and often could articulate no basis for her complaint. Although the Court agrees that McKinney often complained for no apparent reason, it is undisputed that McKinney learned in January 2007 that she was paid less than two other employees who performed the same job and were hired at about the same time. Based on that information, a reasonable jury could conclude that when McKinney made an EEO complaint on February 9, 2007, she had a good-faith belief that she had been discriminated against.

Defendant also argues that McKinney cannot show causation based solely on timing, i.e., the fact that her employment was terminated roughly seven weeks after her EEO complaint. Defendant, of course, is correct that "[e]vidence of temporal proximity . . . standing on its own, is insufficient to establish a causal connection for a claim of retaliation." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008). Temporal proximity, however, is not the only the evidence McKinney has produced to show causation. McKinney also has put forth evidence that two weeks before she complained about discrimination, Bailey gave her a rating of "On Target." McKinney has also put forth evidence that after she complained about discrimination, Bailey and Skarosi met with her and demanded that she stop contacting the EEO office and start discussing issues with them. Skarosi told McKinney that "issues could be resolved on his level" and that she should "drop the Complaint." One month later, McKinney was terminated. From these facts, a reasonable jury could conclude that McKinney was discharged in retaliation for her February 9, 2007 complaint of discrimination. Of course, a reasonable jury could also conclude that defendant lawfully terminated McKinney's employment due to her conduct. This is an issue for a jury.

Defendant is not entitled to judgment as a matter of law with respect to McKinney's retaliation claim. Its motion for summary judgment as to McKinney's retaliation claim is, therefore, denied.

IV. **Conclusion**

For the reasons set forth above, the Court grants in part and denies in part defendant's motion for summary judgment. Defendant is granted summary judgment with respect to plaintiff's claims of sex, race and age discrimination. Plaintiff's retaliation claim may proceed. This case is set for status on April 7, 2014.

ENTER:

George M. Marovich
United States District Judge

DATED: February 3, 2014